UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARK MILLER, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DURHAM GROUP, LTD., et al.,<br><br>Defendants. | Case No. 19-cv-04185-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FOR FAILURE TO STATE A CLAIM**<br><br>Re: Dkt. No. 13 |

## INTRODUCTION

Plaintiff Park Miller LLC ("Miller"), a wealth advisory firm, advised its clients to invest in defendant Durham Group, Ltd. ("DGL"). Multiple promissory notes were executed between those clients and DGL. In November 2018, DGL defaulted on the promissory notes, for which the plaintiff clients ("the contracting plaintiffs") bring breach of contract claims.[1] The plaintiffs name DGL, Craig McGrain, the President and owner of DGL, and other allegedly related corporations owned by McGrain (Durham Commercial Capital Corp. ("DCC"), First Austin Funding Corp. ("First Austin"), and Maasai Holdings LLC ("Maasai Holdings")) as defendants that engaged in fraud by misrepresenting and concealing the financial status of DGL. Miller contends that these fraudulent actions also interfered with its business relationship with its clients.

Defendants concede that the breach of contract claims against DGL and DCC state plausible causes of actions. The remaining defendants seek dismissal for lack of personal jurisdiction and, failing that, dismissal of the breach of contract claims as to them. All defendants

---

[1] The contracting plaintiffs are Henry S. Lawson, Marcia Lawson, Lawson Land, Inc., Edward Miner, James Combs, Dorothy Combs, Gregory Combs and Suzanne Combs, Roger E. Choplin and Carolyn J. Mone and various trusts of which they are co-trustees.

1  move to dismiss the fraud claims. I agree that plaintiffs have not sufficiently alleged personal
2  jurisdiction over McGrain, First Austin and Maasai Holdings and have not met Federal Rule of
3  Civil Procedure 9(b)'s requirement to state fraud claims with particularity. I GRANT defendants'
4  motion with leave to amend.

## BACKGROUND

### I. PROCEDURAL BACKGROUND

On July 19, 2019, plaintiffs filed a complaint bringing multiple breach of contract claims and several claims based on fraud and misrepresentation. Complaint ("Compl.") [Dkt. No. 1]. On September 25, 2019, defendants moved to dismiss the Complaint for lack of personal jurisdiction and for failure to state a claim, to which plaintiffs responded with both an opposition and a First Amended Complaint ("FAC"). Plaintiffs argue that the FAC adds more allegations about personal jurisdiction, particularly regarding the alter ego theory, and contend that the FAC moots defendants' arguments on failure to state a claim. Oppo. 1.

In their reply, defendants request that I address their motion to dismiss despite the filing of the FAC, arguing that the FAC does not address the arguments made in the motion, and that the arguments continue to apply to the two additional plaintiffs added in the FAC. Reply [Dkt. No. 20] 3 n.2. I heard argument on November 13, 2019.

### II. FACTUAL BACKGROUND

#### A. The Parties

Miller is incorporated in California and is engaged in comprehensive planning, investment management and other related services. Complaint ("Compl.") [Dkt. No. 1] ¶ 1. The contracting plaintiffs reside in California or, in Lawson Land Inc.'s case, is incorporated in California. *Id.* ¶¶ 2-9; *see also* First Amended Complaint ("FAC") [Dkt. No. 19] ¶ 10-11 (adding two more clients of Park Miller LLC as plaintiffs). All corporate defendants are incorporated in New York and McGrain is a New York resident. *Id.* ¶¶ 12-16

DCC is a factoring business, which purchases invoices owed to businesses in return for a percentage of the invoiced amounts. Declaration of Craig McGrain ("McGrain Decl.") [Dkt. No. 13-1] ¶ 2. DGL borrows money through promissory notes and raises capital to fund DCC's

2

factoring business. *Id.* First Austin sells paper products. Maasai Holdings is a debt buyer. *Id.* ¶¶ 5-6. Plaintiffs allege that McGrain is the President of DGL, the Chief Executive Officer of DCC, and is in control of or owns First Austin and Maasai Holdings. *Id.* ¶¶ 12-16.

### B. The Promissory Notes

Miller alleges that defendants induced it to advise its clients, the contracting plaintiffs, to invest in DGL by intentionally misrepresenting DGL's financial status and concealing crucial information. FAC ¶ 104. Each of the contracting plaintiffs entered into promissory notes with DGL to invest millions of dollars to fund DCC's factoring business. FAC ¶¶ 30-50; *see also id.* FAC, Exs. A-I (copies of the promissory notes between each contracting plaintiff and DGL). Each contracting plaintiff brings breach of contract claims against all defendants for defaulting on the promissory notes and failing to take action in order to cure the default. FAC ¶¶ 62-101 (causes of action ("COAs") 1-5). As to these breach of contract claims, defendants move to dismiss the claims against all defendants except DGL/DCC, arguing that the other defendants are not parties to the underlying promissory notes. Mot. 1.[2]

### C. Defendants' Fraudulent Acts and Misrepresentation

Beginning no later than the first quarter of 2018, plaintiffs allege that defendants knew or should have known that their financial status had detrimentally changed because one of the entities to which they provided $1,797,000 was in default. FAC ¶ 51. Defendants identify this entity as 1-800 Solar in their reply. *See* Reply in Support of Motion to Dismiss ("Reply") [Dkt. No. 20] 7. Plaintiffs contend that in April 2018, defendants knew or should have known that 1-800 Solar also filed for bankruptcy. FAC ¶ 51. Despite this knowledge, the financial statements of DGL and DCC emailed to Miller between January 2018 and November 2018 continued to reflect that the receivables of this bankrupt entity were active assets. *Id.* ¶ 52.

Plaintiffs assert that this false reporting prevented Miller from realizing the true financial condition of DGL and DCC. FAC ¶ 53. They contend that since the beginning of the business

---

[2] At the hearing, defendants clarified that they are not seeking to dismiss the breach of contract claim against DCC given that they do not seek to parse out DGL and DCC as separate entities. *See* Transcript of Proceedings Held on November 13, 2019 ("Transcript") [Dkt. No. 23] 10:12-23.

3

relationship between Miller, McGrain and DGL/DCC in 2010, "McGrain would customarily notify Park Miller of any and all changes to the Durham Entities' financial condition," and on "two prior occasions, McGrain timely notified Park Miller of events that compromised the Durham Entities' financial security." *Id.* ¶ 54.

Plaintiffs assert that this "customary business practice" caused Miller and its clients to rely on "full and accurate disclosure" of DGL/DCC's financial status. FAC ¶ 55. Yet they claim that McGrain "failed to disclose" DGL/DCC's true financial status," "despite the knowledge that the [DGL/DCC] financial status had materially changed." *Id.* McGrain allegedly knew that the financial statements of DGL/DCC did not accurately depict its true financial status and still permitted them to be circulated to plaintiffs. *Id.* Until plaintiffs discovered the inaccurate representations in November 2018, they assert that McGrain had provided evasive and deceptive answers about DGL's and DCC's financial situation during telephone calls with John Miller. *Id.* ¶ 56. They allege that in reliance on these misrepresentations and nondisclosures, Miller facilitated at least two additional promissory notes between its clients and DGL. *See id.* ¶ 58 (identifying contracting plaintiff Lawson Land, Inc. and another client who is not named as a plaintiff).

Plaintiffs claim that the misrepresentations caused contracting plaintiffs to delay efforts to collect from DGL earlier, causing them financial harm. *Id.* ¶ 60. They also contend that the misrepresentation and nondisclosures caused Miller to delay looking into the financial status of the entities beyond the allegedly false financial records provided to them. *Id.* ¶ 61. As a result, Miller allegedly lost clients and fees and suffered severe harm to its reputation as a wealth advisory firm. *Id.*

Based on these allegations, all plaintiffs bring fraud claims against all defendants. FAC ¶¶ 102-138 (Cause of Action ["COA"] 6 for fraud/intentional misrepresentation in under Civ. Code § 1572; COA 7 for fraudulent deceit under Cal. Civ. Code §§ 1709-1710; COA 8-9 for negligence and negligent misrepresentation). Miller also brings two claims against all defendants based on the clients and money it lost due to defendants' fraud. FAC ¶¶ 139-154 (COA 10 for intentional interference with contractual relations; COA 11 for negligent interference with prospective economic relations).

4

**LEGAL STANDARD**

## I. RULE 12(B)(6): MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). However, "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule 8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011). In deciding a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## II. RULE 12(B)(2): MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of personal jurisdiction. The plaintiff then bears the burden of demonstrating that jurisdiction exists. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

The plaintiff "need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995); *Fields v. Sedgwick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986). "Although the plaintiff cannot simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger*, 374 F.3d at 800 (citations omitted). Conflicts in the evidence must be resolved in the plaintiff's favor. *Id.* "Where, as here, the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. In such cases, we only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie showing of personal jurisdiction." *Caruth v. International Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995) (internal punctuation and citation omitted).

Where, as here, there is no applicable federal statute governing personal jurisdiction, the law of the state in which the district court sits applies." *Core-Vent Corp. v. Novel Indus. AB*, 11 F.3d 1482, 1484 (9th Cir. 1993) (citation omitted). "California's long-arm statute allows courts to exercise personal jurisdiction over defendants to the extent permitted by the Due Process Clause of the United States Constitution." *Id.*; Cal. Civ. Proc. Code. § 410.10. "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger*, 374 F.3d at 800-01.

"There are two types of personal jurisdiction: general and specific." *Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986). "[G]eneral jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the word." *Schwarzenegger*, 374 F.3d at 801. It exists where a nonresident defendant's activities within a state are "substantial" or "continuous and systematic." *Data Disc., Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977). Such contracts must "be of the sort that approximate physical presence." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

Specific jurisdiction arises when a defendant's specific contacts with the forum give rise to

the claim in question. *Helicoptoros Nacionales de Columbia S.A. v. Hall*, 466 U.S. 408, 414-16 (1984). "A court exercises specific jurisdiction where the cause of action arises out of or has a substantial connection to the defendant's conduct with the forum." *Glencore Grain Rotterdam BV v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002). The Ninth Circuit employs a three-part test to determine whether there is specific jurisdiction over a defendant:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1023 (9th Cir. 2017).

The first prong may be satisfied by "purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). In tort cases, courts typically inquire whether a defendant "purposefully directs his activities at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Id.*[3] In contrast, in contract cases, courts typically inquire whether a defendant "purposefully avails itself of the privilege of conducting activities or consummates a transaction in the forum, focusing on activities such as delivering goods or executing a contract." *Id.* (citation and internal punctuation omitted).

With regard to the second prong, courts "measure this requirement in terms of 'but for' causation." *Bancroft & Masters*, 223 F.3d at 1088. The plaintiff bears the burden of satisfying the first two prongs of the test. *Schwarzenegger*, 374 F.3d at 802. If the plaintiff succeeds in

---

[3] However, as the Supreme Court reemphasized in *Walden v. Fiore*, 571 U.S. 277, 285 (2014) the "effects" "analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."

7

satisfying both of the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable." *Id.* If the plaintiff cannot satisfy either of the first two prongs, personal jurisdiction is not established in the forum state. *Id.*

**DISCUSSION**

Defendants make three arguments in their motion: (i) dismiss all fraud claims against all defendants for failure to state a claim; (ii) dismiss breach of contract claims against all defendants except DGL/DCC because they were not parties to the underlying promissory notes; (iii) and dismiss McGrain, Maasai Holdings and First Austin for lack of personal jurisdiction. Mot. 1. Essentially, defendants argue that only the breach of contract claims against DGL/DCC should move forward in the FAC. *Id.*[4]

## I. FAILURE TO STATE FRAUD CLAIMS

Plaintiffs' fraud claims are denominated as fraud (COA 6), fraudulent deceit (COA 7), negligence based on misrepresentations (COA 8), negligent misrepresentation (COA 9), intentional interference with contract (COA 10) and negligent interference with prospective economic relations (COA 11). COA 6 through 9 relate to alleged promissory fraud that occurred on the promissory notes between contracting plaintiffs and DGL, and COA 10 and 11 relate to the business relationships that were allegedly severed between Miller and its clients due to defendants' interfering actions. To sufficiently allege these claims, plaintiffs must meet the heighted pleading standard under Rule 9(b) and state with particularity the circumstances constituting fraud.

### A. Specificity of Fraud Claims

Defendants initially argued that the Complaint only alluded to false representations about

---

[4] Defendants say that this case is really about "the unfortunate circumstances of a law firm and a doctor that deceived [DCC] and their own clients, stealing millions of dollars, and leaving DCC and Plaintiffs facing the losses from the law firm's and the doctor's criminal and unethical conduct." Mot. 1-2. DGL ultimately breached the promissory notes with Miller's clients because of this alleged illegal activity. *Id.* at 2. Defendants argue Miller and the contracting plaintiffs attempt to make this a bigger case, involving parties that have no contact with California and its residents and who was not involved in DCC's factoring business. *Id.* at 8. This is why defendants are not seeking dismissal of the breach of contract claims as to DGL and DCC.

financial health of DGL/DCC because it contained one conclusory paragraph. Mot. 20; Compl. ¶ 29 ("Within the last three years, Defendants materially misrepresented [DGL's] financial status to Plaintiffs and hid crucial financial information from Plaintiffs both through verbal communications and through financial reports and presentations.").

Plaintiffs argue that their FAC identifies with sufficient particularity the who, what, when, where and how of the misconduct. Oppo. 11. But defendants contend that the one alleged "misrepresentation" plaintiffs added in their FAC does not suffice. Reply 11. They assert that the one entity discussed in the FAC, identified as 1-800 Solar, did not owe the receivables that DCC was owed; those were owed by 1-800's clients to DCC. *Id.* at 8, n.6. Accordingly, they claim that 1-800 Solar's bankruptcy did not affect 1-800 Solar's ability to pay DCC, and in turn did not impact contracting plaintiffs from collecting regular payments from DGL. *Id.* at 8.

Defendants claim that the monthly accounts receivable aging reports received by John Miller (and thus Miller) showed the $1.8 million 1-800 Solar receivables aging into default, establishing that DGL did inform plaintiffs about the 1-800 Solar receivables for months. Reply 8 (citing to McGrain Decl. ¶¶ 10-11). Defendants also point out that John Miller was given access to the "Durham computer system to review the accounts and any other financial information Mr. Miller desired when he visited the [DGL's New York offices], about twice a year." Reply 12; *see also* McGrain Decl. ¶ 11. Defendants conclude that plaintiffs had access to the relevant information, making their fraud allegations implausible.

Plaintiffs stated at the hearing that they do not have a problem with the defendants' reply arguments being considered on this motion. But regardless of defendants' explanation about 1-800 Solar, plaintiffs have not sufficiently pleaded a fraud claim with particularity in the FAC. Some of the crucial information that they rely on is found in their opposition or attached declarations, not in the FAC. For example, plaintiffs allege in the FAC that "one of the entities" to which defendants provided $1,797,000 was in default and filed for bankruptcy, FAC ¶ 51, but that alleged entity is not identified as 1-800 Solar prior to plaintiffs' filing of the declarations accompanying the opposition. *See* Miller Decl. ¶ 13 ("Around $1,797,000 worth of receivables owed by a particular company known as 1-800 Solar were represented as good assets when in fact

9

the company was in default and had filed for bankruptcy in April 2018. This meant that there was no chance of recovery on the 1-800 Solar assets, yet they continued to remain on the books as an asset.").

At the hearing, plaintiffs also argued that when John Miller asked McGrain whether the receivables were any good, McGrain simply replied, "No they're not." This allegation does not appear in the FAC. The only allegation in the FAC generally states, "McGrain provided evasive and deceptive answers about DCC and DGL's financial situation via telephone calls with John Miller." FAC ¶ 56. The FAC asserts that Miller "discover[ed] [] the inaccurate representations in November 2018," but it does not describe how John Miller learned that the 1-800 Solar receivables were in fact worthless and non-recoverable and why that fact would necessarily contradict what was depicted in the financial statements emailed to him. In short, the FAC does not sufficiently link how the circumstances surrounding 1-800 Solar constitute fraud. An amended complaint that addresses these deficiencies and collectively includes all relevant factual allegations will help clarify that plaintiffs' fraud claims meet the level of particularity required by Rule 9(b). Defendants' motion to dismiss the fraud claims is GRANTED with leave to amend.

### 1. Promissory Fraud Claims

Some of plaintiffs' claims relate to the promissory fraud that occurred pertaining to the promissory notes between contracting plaintiffs and DGL. These include fraud/intentional misrepresentation, fraudulent deceit, and negligent misrepresentation. *See* FAC (COAs 6, 7 and 9). Defendants argue that these claims have been insufficiently alleged because plaintiffs only alleged mere nonperformance; there must be other factual allegations to adequately allege that a defendant knowingly made false promises without an intent to perform. *See Sunnyside Development Co., LLC v. Opsys Ltd.*, No. C 05-0553 MHP, 2005 WL 1876106, *6 (N.D. Cal. Aug. 8, 2005). Defendants point out that the promissory notes that predated November 2018 received regular interest payments for years. Mot. 21; McGrain Decl. ¶ 11. They argue that these claims should be dismissed as to all defendants, including DGL, a party to the underlying promissory notes, because plaintiffs have not alleged that DGL entered into the promissory notes intending to breach. Mot. 22.

10

Plaintiffs allege that "[i]n reliance on these misrepresentations/nondisclosures, Park Miller facilitated at least two additional promissory notes between its clients and Durham," including the 2018 promissory note with Lawson Land, Inc., one of the contracting plaintiffs and Miller's client. FAC ¶ 58. This promissory note was executed on July 2, 2018, after the alleged April 2018 bankruptcy of 1-800 Solar. *Id.* ¶¶ 34, 51; *see also id.* ¶ 34 & Ex. C (copy of the 2018 promissory note with Lawson Land, Inc.). Therefore, plaintiffs contend that defendants "knew or should have known that DGL did not have the ability to comply with the terms of [this promissory note] and could not pay the Lawsons interest or the principal sum back." *Id.* ¶ 59.

Assuming plaintiffs fix the deficiencies of their underlying fraud claims as discussed above, these allegations could be sufficient to show promissory fraud as to contracting plaintiff Lawson Land, Inc. But plaintiffs do not explain their promissory fraud claims concerning the other eight contracting plaintiffs, all of whom executed their promissory notes before the first quarter of 2018 (when plaintiffs claim defendants began their misrepresentations about 1-800 Solar). FAC ¶¶ 31, 33, 37, 38, 41, 44, 47, 48; *see also id.*, Exs. A, B, D-I. Plaintiffs have not alleged facts surrounding their theory that DGL entered into these promissory notes knowing it could not perform on them.

### 2. Interference Claims

Miller also brings two interference claims sounding in fraud – intentional interference with business relations and negligent interference with prospective business relations. *See* FAC (COAs 10 and 11). It alleges that as a result of the misrepresentations and nondisclosures, Miller delayed looking into the financial status of the entities beyond the false records provided to it, which in turn caused it to lose clients and suffer harm to its reputation as a wealth advisory firm. FAC ¶ 61. This is the only allegation in the FAC that alludes to the interference claims.

Plaintiffs argue that they are not required to plead these claims with Rule 9(b) specificity. Oppo. 14. They rely on *Oracle Am., Inc. v. TERiX Computer Co., Inc.*, No. 5:13-CV-03385-PSG, 2014 WL 31344, at *11 (N.D. Cal. Jan. 3, 2014) for the contention that "Rule 9(b) might apply to an interference claim presented entirely on [] fraudulent conduct or conduct sounding in fraud," but it does not apply when an "interference claim relies on several instances of misconduct[.]" *Id.*

11

Because Miller characterizes its interference claims as resting on both defendants' misrepresentations and DGL's failure to perform on the underlying promissory notes, it concludes that Rule 9(b) does not apply. *Id.* But this characterization of its interference claims is not clearly reflected in the FAC.

Even if Rule 9(b) does not apply, Miller has not alleged any "specific, intentional breaches of contract." *Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. C 14-0437 CW, 2014 WL 5812294, at *8 (N.D. Cal. Nov. 7, 2014). For example, in *Heartland*, the plaintiff asserted that it "identified nearly thirty merchants who have left Heartland for Mercury within the last six months prior to filing the Complaint," but admitted it does not know "why every merchant who leaves Heartland has chosen to do so," and cannot know without discovery. *Id.* Nonetheless, the court still dismissed the interference claims because the plaintiff "[did] not allege that any of its contracts with any former merchant have actually been breached, much less breached because of interference by [the defendant]." *Id.* Here, Miller only generally alleges that it has "lost clients" but does not allege how many were lost and whether it was due to defendants' actions. Miller has also not specifically alleged that any of its contracts have been breached or any prospective economic relations that have been lost.

For the reasons set forth above, defendants' motion to dismiss the fraud claims is GRANTED with leave to amend.

## II. FAILURE TO STATE BREACH OF CONTRACT CLAIMS

Defendants also seek to dismiss the breach of contract claims against all defendants except DGL and DCC, arguing that the other defendants are not parties to the underlying promissory notes at issue. Mot. 22. As discussed in the next section, this court lacks personal jurisdiction over McGrain, First Austin and Maasai Holdings. Defendants' motion to dismiss the breach of contract claims as to McGrain, First Austin and Maasai Holdings is moot in light of my lack of jurisdiction.

## III. LACK OF PERSONAL JURISDICTION OVER MCGRAIN

Defendants seek to dismiss McGrain under Rule 12(b)(2) for lack of personal jurisdiction. Mot. 14. They claim that he does not have sufficient "continuous and systematic" contacts with

California as a New York resident to confer general jurisdiction, and that he does not have sufficient involvement in the alleged conduct to establish specific jurisdiction. Mot. 14-15. Plaintiffs respond that: (i) specific personal jurisdiction exists over McGrain because he purposefully directed his business activities at California; (ii) the fiduciary shield doctrine does not insulate McGrain from personal jurisdiction because he committed intentional torts; and (iii) he acted as the alter ego of DCC or DGL, and therefore the entities' contacts are applicable to him too. *See* Oppo. 6-9. Plaintiffs have not provided sufficient allegations in their FAC to support those arguments.

### A. Specific Personal Jurisdiction

Plaintiffs argue that there is specific personal jurisdiction over McGrain because he "purposefully directed his business activities at California and has negotiated and consummated the transactions that require performance in California and gave rise to this suit." Oppo. 6. To support this argument, plaintiffs cite the declaration by John Miller, which is attached to their opposition. *Id.*; Declaration of John Miller ("Miller Decl.") [Dkt. No. 18-1].

First, plaintiffs assert that McGrain knew Miller was a California corporation, as reflected in their business interactions, and that many of its clients were California residents, as reflected in the promissory notes. Oppo. 2; Miller Decl. ¶¶ 3-7, Exs. A-C (email exchange between Miller and McGrain discussing time zone difference). McGrain signed at least three promissory notes between DGL and contracting plaintiffs and other Miller clients that specify performance in California. Oppo. 2; Miller Decl. ¶ 7, Exs. D-E (copies of promissory notes with California addresses which McGrain signed). Defendants admit that McGrain negotiated the terms and signed three promissory notes, but argue that those promissory notes were executed between October 2010 and May 2011, which is outside the relevant 2016 - 2018 time period of the alleged fraud and misrepresentation. Reply 5; Suppl. McGrain Decl. ¶ 14 (citing to FAC, Exs. A, D and H of promissory notes entered between October 2010 and May 2011). Defendants contend that only promissory notes entered between 2016 and 2018 are relevant to this case as those are the ones

that give rise to the fraud/misrepresentation claims. *Id.*[5]

Second, plaintiffs argue that McGrain was involved with drafting the terms of at least one of the promissory notes between a Miller client who resides in California and DGL. Oppo. 6; Miller Decl. ¶ 8, Ex. F (email exchange between McGrain and Miller discussing changes to a promissory note). Defendants respond that McGrain admits to helping draft the terms of one promissory note, but clarify that none of the plaintiffs were a party to this promissory note and that it is not relevant to the issues in this case. Reply 5; Suppl. McGrain Decl. ¶ 14 (noting that the promissory note executed on August 25, 2017 did not involve any of the plaintiffs or the alleged fraud and misrepresentation claims in this case).

Third, plaintiffs state that McGrain was copied on virtually all communications between Miller and DGL/DCC. Oppo. 6; Miller Decl. ¶¶ 10, 12, Ex. H (copies of emails to Miller with attached financial reports, on which McGrain is also a recipient). Defendants respond that plaintiffs have put forth various correspondence, most of which falls outside the relevant time period or is a communication sent by someone other than McGrain. Reply 5, n.3. They contend that none of the correspondence addresses the specific contracts at issue in this case. *Id.*

Plaintiffs have not sufficiently alleged that McGrain's acts purposefully availed him to California. Their arguments are in a declaration attached to its opposition, not in the FAC. Moreover, plaintiffs have not explained how McGrain's activities arose out of or relate to the underlying fraud and misrepresentation claims in this case. They have not alleged how McGrain's activities relate to the alleged misrepresentation in 2018 about 1-800 Solar and its effect on the financial health of DGL/DCC. Accordingly, they have not demonstrated that exercise of specific personal jurisdiction over McGrain is proper.

**B.    Fiduciary Shield Doctrine**

Even if minimum contacts were established, defendants argue that the fiduciary shield

---

[5] In their original Complaint, plaintiffs alleged that the misrepresentation occurred "within the last three years." Compl. ¶ 29. But the FAC now alleged that it occurred in 2018, given the circumstances around 1-800 Solar. FAC ¶ 51. Given that the FAC was filed at the time of the opposition, it appears that the relevant time period now is 2018, not between 2016 and 2018. Regardless, defendants' argument is still applicable as the other promissory notes were executed well before 2018.

doctrine insulates McGrain from personal jurisdiction. Mot. 18. Under the fiduciary shield doctrine, "a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person." *Davis v. Metro Prods., Inc.*, 885 F. 2d 515, 520 (9th Cir. 1989). California state law, which governs all the causes of action in this case, explicitly recognizes the fiduciary shield doctrine. *See Shearer v. Superior Court*, 70 Cal. App. 3d 424, 430 (1977). Thus, defendants argue, the court "cannot impute personal jurisdiction over McGrain simply because he is an officer or agent of DGL or DCC (or any of the other corporations)." Mot. 18.

There are exceptions to the fiduciary shield doctrine. One of them is for intentional tortious acts committed by an officer or owner. *See Seagate v. A.J. Kogyo Co.*, 219 Cal.App.3d 696, 703 (1990). For example, in *Taylor–Rush v. Multitech Corp.*, 217 Cal.App.3d 103, 117–18 (1990), the court held the fiduciary shield doctrine did not insulate New York corporate officers and directors from personal jurisdiction where defendants made fraudulent representations purposely directed to the plaintiff, a California resident, because they were "the primary participants in negotiating and executing" the contracts with plaintiff. But unlike *Taylor–Rush*, defendants argue, McGrain did not make any representations to the contracting plaintiffs or any misrepresentations to Miller. Mot. 19.

Plaintiffs argue that the tortious activity exception to the fiduciary shield doctrine applies because "McGrain failed to disclose the material changes in the financial conditions of DGL and DCC to Park Miller LLC and the other plaintiffs with the intent to induce the plaintiffs to invest more money in DGL and DCC and refrain from taking action to recover their investments." Oppo. 7. Their support for this argument is that McGrain allegedly "permitted" inaccurate financial statements to be sent to Miller and was copied on each of these communications. Oppo. 7; FAC ¶ 55; Miller Decl. ¶ 12. Even if the financial information was inaccurate, simply being copied on an email does not show that McGrain himself took part in the tortious acts of the company. Plaintiffs conclusorily allege that McGrain failed to disclose the material changes in the "financial conditions of DGL and DCC" to Miller and other plaintiffs with "intent to induce the Plaintiffs to invest more money in DGL and DCC and refrain from taking action to recover their

15

investments." *See* FAC ¶ 57. But this bare allegation is not sufficient to trigger the tortious activity exception of the fiduciary shield doctrine. Plaintiffs fail to explain why the fiduciary shield doctrine does not insulate McGrain from the acts of DGL or DCC.

### C. Alter Ego Theory

Alternatively, plaintiffs argue that there is personal jurisdiction over McGrain because he is the alter ego of DGL or DCC. Oppo. 8. To survive a motion to dismiss, a plaintiff asserting application of the alter ego doctrine to extend personal jurisdiction must "allege specifically both the elements of alter ego liability, as well as facts supporting each." *MH Pillars Ltd. v. Realini*, No. 15-CV-1383-PJH, 2017 WL 916414, at *12 (N.D. Cal. Mar. 8, 2017) (internal citation omitted). The plaintiff must show "(1) that there is such unity of interest and ownership that the separate personalities or the two entities no longer exists, and [that] (2) that failure to disregard their separate identities would result in fraud or injustice." *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1021 (9th Cir. 2017) (citing *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015)).

The "unity of interest" prong requires "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Ranza*, 793 F.3d at 1073. (internal quotation marks and citations omitted). Courts generally consider nine factors in assessing whether the unity of interest prong of an alter ego relationship is satisfied:

> (1) the commingling of funds and other assets of the entities, (2) the holding out by one entity that it is liable for the debts of the other, (3) identical equitable ownership of the entities, (4) use of the same offices and employees, (5) use of one as a mere shell or conduit for the affairs of the other, (6) inadequate capitalization, (7) disregard of corporate formalities, (8) lack of segregation of corporate records, and (9) identical directors and officers.

*Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014) (citation omitted). While a court need not find that every factor is present, *Updateme Inc. v. Axel Springer SE*, No. 17-CV-05054-SI, 2018 WL 1184797, at *10 (N.D. Cal. Mar. 7, 2018), the Ninth Circuit has specifically found that "[t]otal ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Ranza*, 793 F.3d at 1073. A parent's involvement in "macro-management issues" does not satisfy this element; the plaintiff must show that the parent directs

16

the subsidiary's "day-to-day operations" and that the "entities failed to observe their separate corporate formalities." *Id.* at 1074-1075.

Plaintiffs argue that McGrain is the alter ego of DCC and DGL because he has an ownership interest in both entities, uses the same email addresses from both entities, and treats the assets of DGL and DCC as interchangeable. FAC ¶¶ 25-26. As defendants correctly point out, the intermingling of assets between DGL and DCC might support an alter ego theory between DGL and DCC but does not provide allegations of an alter ego theory involving McGrain. Reply 13. Plaintiffs have failed to show that McGrain was acting as the alter ego of DGL and DCC such that personal jurisdiction over McGrain would be appropriate under the alter ego theory.

Altogether, plaintiffs have failed to: (i) sufficiently plead specific personal jurisdiction over McGrain because they do not allege how any of his contacts with California arise out of or relate to the underlying claims; (ii) even if minimum contacts were established, plaintiffs do not allege why the fiduciary shield doctrine should not insulate McGrain from personal jurisdiction; and (iii) plaintiffs have not alleged that McGrain is the alter ego of DGL or DCC. I GRANT defendants' motion to dismiss McGrain for lack of personal jurisdiction.

## IV. LACK OF PERSONAL JURISDICTION OVER FIRST AUSTIN AND MAASAI HOLDINGS

Defendants also seek to dismiss First Austin and Maasai Holdings for lack of personal jurisdiction. Mot. 12-14. In opposition, plaintiffs argue that personal jurisdiction over First Austin and Maasai Holdings is proper under the alter ego theory. Oppo. 8-9. But they fail to sufficiently allege both elements of alter ego liability, *i.e.*, that a unity of interest exists between these two entities and DGL/DCC, and that the failure to disregard their separate identities would result in fraud or injustice. *See Ranza*, 793 F.3d at 1073.

### A. First Austin

Plaintiffs argue that First Austin is subject to personal jurisdiction in California because it was acting as the alter ego of DGL and DCC. Oppo. 8. In their original Complaint, plaintiffs alleged that McGrain, who is President of DGL and CEO of DCC, also controls and has an ownership interest in First Austin. Oppo. 8; Compl. ¶ 14; FAC ¶ 16. In the FAC, plaintiffs added

an allegation that First Austin mingled its assets with DCC when it secured an interest in DCC's assets by buying a line of credit owed by DCC to its bank, Crestmark Bank. *Id.* (citing FAC ¶¶ 25-29). Accordingly, plaintiffs allege that First Austin "now holds the primary security interest in all DCC's assets" and DGL "has a subordinated claim to [DCC's] assets." FAC ¶ 27. Plaintiffs also point to First Austin's website, durhamltd.com, and the fact that First Austin's address and phone number are the same as DCC and DGL as evidence that the entities act as one. Declaration of Stuart Park Decl. ("Park Decl."), Ex. C (screenshot of the durhamltd.com website).

Defendants counter that this is insufficient to show general or specific jurisdiction over First Austin. First, defendants argue that the mere fact that McGrain has an ownership interest in DCC, DGL and First Austin is not enough to confer jurisdiction over First Austin. Mot. 12. Second, defendants contend that plaintiffs' new allegation regarding the mingling of assets between First Austin and DCC does not necessarily show that DCC or DGL have "fraudulently transferred its assets to First Austin to wrongfully underfund the company." Reply 10. Instead, defendants clarify, First Austin purchased DCC's line of credit debt from Crestmark Bank in March 2019, "well after the time period in question.". Supplemental Declaration of Craig McGrain ("Suppl. McGrain Decl.") [Dkt. No. 20-1] ¶ 7. Defendants further add that after First Austin purchased DCC's line of credit debt, "First Austin was in no better security position than Crestmark had been." *Id.* Third, defendants contend that a review of First Austin's website, durhamltd.com, confirms that First Austin dba Durham Ltd. sells paper products and that First Austin is not DCC or DGL, nor did it have any relation to the promissory notes at issue in this case. Reply 10-11. They explain that First Austin shares an address and phone number with DCC and DGL because it subleases space to DCC and DGL, and point out that plaintiffs have not provided a case in which this is sufficient to confer personal jurisdiction. *Id.* at 11. Defendants assert that First Austin is a "separate business entity" that "has maintained corporate formalities required under New York law," and "maintains its own, separate bank accounts; and files its own, separate tax returns." Suppl. McGrain Decl. ¶ 7.

Plaintiffs' allegations that First Austin is the alter ego of DCC and DGL are insufficient, even without consideration of the purported explanations offered by defendants in reply and its

18

1 declarations. It is not clear how the allegation that First Austin bought a line of credit debt owed by DCC demonstrates that DCC or DGL fraudulently transferred its assets to First Austin to wrongfully underfund the company. Plaintiffs' only other allegations are that McGrain has an ownership in both First Austin and DGL/DCC, and that the two entities share contact information. But the Ninth Circuit has found that "[t]otal ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015). Even if these were enough to establish a unity of interest, plaintiffs are required to "allege *specifically both* of the elements of alter ego liability, as well as facts supporting each;" the FAC does not state any inequitable result that would result from respecting the corporate form of these separate entities. *Sandoval*, 34 F. Supp. 3d at 1040 (citation omitted). Plaintiffs have not sufficiently alleged that this court can exercise personal jurisdiction over First Austin based on an alter ego theory.

### B. Maasai Holdings

In their FAC, plaintiffs add allegations that Maasai Holdings is owned by McGrain and shares the same address as DCC. FAC ¶ 29. They further assert that Maasai was created "in order to hold the inactive assets" of DCC and DGL and that the DCC and DGL "financial statements reflect that one or more loans were owed to it by Maasai." *Id.*

Defendants counter that Maasai is a "debt buyer" and that Maasai "had no involvement in any of [the] loan agreements or the factoring business" at issue in this case or any activities in California. Mot. 13-14. They state that Maasai Holdings is a "separate business entity" that "has maintained business formalities required under New York law," and has "its own separate bank accounts," and accounting records. Suppl. McGrain Decl. ¶ 8.

Plaintiffs have failed to plausibly allege that Maasai Holdings is an alter ego of DCC and DGL. A conclusory allegation that plaintiffs are "informed and believe" that Maasai "was created in order to hold the inactive assets" of DGL and DCC is insufficient without supporting factual allegations. In addition, as stated above with respect to First Austin, total ownership and shared address is not enough to show unity of interest. *Ranza*, 793 F.3d at 1073. Plaintiffs have only alleged facts as to one of the nine unity factors; failure to address the other factors strongly weighs

19

against a finding that DCC or DGL's contacts should be imputed to Maasai Holdings. *See, e.g.*, *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F.Supp.3d 938, 955 (N.D. Cal. 2015) (unaddressed factors weigh against finding of alter ego status); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 984 (N.D. Cal. 2016) (finding plaintiffs only alleged facts as to identical ownership, same offices, and identical directors, and failure to address other factors weighed against finding alter ego status). Plaintiffs have also not alleged any inequitable result in support of alter ego liability. They have not demonstrated that this court can exercise personal jurisdiction over Maasai Holdings.

McGrain, First Austin, and Maasai Holdings are DISMISSED for lack of personal jurisdiction. Plaintiffs may amend their complaint to add sufficient allegations that would confer jurisdiction over these defendants. Plaintiffs request for jurisdictional discovery is denied at this stage but may be renewed depending on any added allegations in a second amended complaint.

## CONCLUSION

First Austin, Maasai Holdings, and McGrain are DISMISSED for lack of personal jurisdiction. Defendants' motion to dismiss breach of contract claims against all defendants except DGL and DCC is GRANTED for failure to state a claim. Defendants' motion to dismiss fraud claims against all defendants is GRANTED for failure to state a claim. Given the upcoming holidays, plaintiffs are given thirty days from the date below to amend.

**IT IS SO ORDERED.**

Dated: December 16, 2019

William H. Orrick
United States District Judge