1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7   PARK MILLER, LLC, et al.,                Case No.  19-cv-04185-WHO

8                    Plaintiffs,
                                             **ORDER GRANTING IN PART AND**
9        v.                                  **DENYING IN PART MOTION TO**
                                             **DISMISS THE SECOND AMENDED**
10  DURHAM GROUP, LTD., et al.,              **COMPLAINT; DENYING MOTION**
                                             **FOR SANCTIONS**
                     Defendants.
11                                           Re: Dkt. Nos. 33, 37

12

13          Plaintiff Park Miller LLC ("Park Miller"), a wealth advisory firm, advised its clients to

14  invest in defendant Durham Group, Ltd. ("DGL").  Multiple promissory notes were executed

15  between those clients and DGL.  DGL defaulted on the promissory notes, for which the plaintiff

16  clients ("the contracting plaintiffs") bring breach of contract claims.[1]  Plaintiffs name DGL, Craig

17  McGrain, the president and owner of DGL, and other allegedly related corporations owned by

18  McGrain (Durham Commercial Capital Corp. ("DCC"), First Austin Funding Corp. ("First

19  Austin"), and Maasai Holdings LLC ("Maasai Holdings")) as defendants that engaged in fraud by

20  misrepresenting and concealing the financial status of DGL.  Park Miller contends that these

21  fraudulent actions also interfered with its business relationship with its clients.

22          Before me is a second round of motion to dismiss and a related motion for sanctions for

23  filing the Second Amended Complaint ("SAC").  For the reasons set forth below, and in my prior

24  order, defendants' motion to dismiss McGrain, First Austin and Maasai Holdings for lack of

25

26

27  [1] The contracting plaintiffs are Henry S. Lawson, Marcia Lawson, Lawson Land, Inc.,
    (collectively the "Lawsons"), Edward Miner, James Combs, Dorothy Combs, Gregory Combs and
28  Suzanne Combs, Roger E. Choplin and Carolyn J. Mone and various trusts of which they are co-
    trustees.

United States District Court
Northern District of California

1   personal jurisdiction is GRANTED. Their motion to dismiss the breach of contract claims against

2   these three defendants is moot in light of my lack of jurisdiction. Their motion to dismiss the

3   fraud claims against the remaining defendants, DGL and DCC, is DENIED in part and

4   GRANTED in part. Their related motion for sanctions, which largely repeats arguments made in

5   the motion to dismiss, is DENIED.

**BACKGROUND**

6

7   **I.     PROCEDURAL BACKGROUND**

8          On July 19, 2019, plaintiffs filed a complaint bringing multiple breach of contract claims

9   and several claims based on fraud and misrepresentation. Complaint ("Compl.") [Dkt. No. 1].

10  Defendants moved to dismiss the Complaint for lack of personal jurisdiction and for failure to

11  state a claim, to which plaintiffs responded with both an opposition and a First Amended

12  Complaint. First Amended Complaint ("FAC") [Dkt. No. 19].

13         Defendants requested that I address their motion to dismiss the Complaint despite the filing

14  of the FAC. I dismissed First Austin, Maasai Holdings and McGrain for lack of personal

15  jurisdiction, and granted defendants' motion to dismiss the breach of contract claims against all

16  except DGL and DCC and the fraud claims against all defendants. *See* Order Granting Motion to

17  Dismiss for Lack of Personal Jurisdiction and For Failure to State a Claim ("Order") [Dkt. No.

18  24]. Plaintiffs were given leave to amend.

19         The SAC brings the same causes of actions against the same defendants and expands on

20  some allegations. Second Amended Complaint ("SAC") [Dkt. No. 29]. Defendants move to

21  dismiss on the same grounds as before. *See* Notice of Motion and Motion to Dismiss Second

22  Amended Complaint for Lack of Personal Jurisdiction and for Failure to State a Claim ("MTD")

23  [Dkt. No. 33]. They also move for sanctions against plaintiffs and their counsel for filing the

24  SAC. *See* Defendants' Notice of Motion and Motion for Sanctions Against Plaintiffs and Their

25  Counsel ("Mot. Sanctions") [Dkt. No. 37]. These matters are appropriate for disposition without

26  oral argument. The April 22, 2020 hearing on the MTD has already been vacated and I VACATE

27  the May 6, 2020 hearing on the sanctions motion as well.

28

United States District Court
Northern District of California

## II.   FACTUAL BACKGROUND

### A.   The Parties

Park Miller is incorporated in California and is engaged in comprehensive planning, investment management and other related services.  SAC ¶ 1.  The contracting plaintiffs reside in California (Lawson Land Inc. is incorporated in California).  *Id.* ¶¶ 2-11.  All corporate defendants are incorporated in New York and McGrain is a New York resident.  *Id.* ¶¶ 12-16

DCC is a factoring business, which purchases invoices owed to businesses in return for a percentage of the invoiced amounts.  SAC ¶ 25.  DGL borrows money through promissory notes and raises capital to fund DCC's factoring business.  *Id.*

Maasai Holdings is a debt buyer. SAC ¶ 31.  Defendants contend that First Austin sells paper products, but plaintiffs allege that it is also involved in factoring invoices.  Plaintiffs allege that McGrain is the president of DGL, the chief executive officer of DCC, and is in control of or owns First Austin and Maasai Holdings.  *Id.* ¶ 16.  Their allegations as to these three defendants (McGrain, First Austin and Maasai Holdings) are more thoroughly discussed in Sections IV and V of this Order.

### B.   The Promissory Notes

Plaintiffs allege that their relationship with defendants began in 2010 when McGrain reached out to Park Miller to secure funds for DCC's factoring business.  SAC ¶ 37.  After Park Miller conducted an extensive analysis of DGL and DCC, it "reached out to [its] clients with this potential investment opportunity."  *Id.* ¶ 38.

Each of the contracting plaintiffs entered into promissory notes with DGL to invest millions of dollars to fund DCC's factoring business.  SAC ¶¶ 46-65; *see also id.*, Exs. A-I (copies of the promissory notes between each contracting plaintiff and DGL).  Plaintiffs seek relief on six of the promissory notes that were breached: December 20, 2017 and July 2, 2018 promissory notes with the Lawsons (Exhibits B and C); October 28, 2014 promissory note with Miner (Exhibit E); October 28, 2014 promissory note with James and Dorothy Combs (Exhibit F); November 9, 2016 promissory note with Gregory and Suzanne Combs (Exhibit G); October 28, 2016 promissory note with Choplin and Mone (Exhibit I).

United States District Court
Northern District of California

Each contracting plaintiff brings breach of contract claims against all defendants for defaulting on the promissory notes and failing to take action in order to cure the default. SAC ¶¶ 93-132 (causes of action ("COAs") 1-5). As to these breach of contract claims, defendants move to dismiss the claims against all defendants except DGL/DCC, arguing that the other defendants are not parties to the underlying promissory notes. MTD 1-2.[2]

## C. Defendants' Fraudulent Acts and Misrepresentation

### 1. The 1-800 Solar Receivables

Plaintiffs allege that "[b]eginning no later than when Defendants commenced dealing with 1-800 Solar on or about 2016, they knew that the 'factored receivables' were not of value and worth what they claimed." SAC ¶ 66. They contend that defendants "learned soon thereafter that there were issues with 1-800 Solar's financial condition and the collectability of the receivables." *Id.* In particular, they claim that "[p]rior to but certainly not later than April 2018, Defendants knew or should have known 1-800 Solar was in financial distress" because it filed for bankruptcy. *Id.*

Despite this knowledge, the financial statements of DGL/DCC continued to reflect the 1-800 Solar receivables as active full value assets, and these allegedly incorrect financial statements were provided to John Miller ("Miller"), and thus the firm Park Miller, during his visit to the DGL/DCC office in early November 2018. SAC ¶¶ 67-68. Plaintiffs assert that this false reporting prevented Park Miller from realizing the true financial condition of DGL and DCC "when their status began to deteriorate no later than the first quarter of 2018." *Id.* ¶ 69.

### 2. Inaccurate Financial Information Regarding 1-800 Solar

Plaintiffs contend that since the beginning of the business relationship between Park Miller, McGrain and DGL/DCC in 2010, "McGrain would customarily notify Park Miller of any and all changes to the Durham Entities' financial condition," and on "at least three prior occasions,

---

[2] Defendants previously did not seek to dismiss claims against DCC given that they did not seek to parse out DGL and DCC as separate entities. Order at 3 n.2. They now ask to dismiss claims against DCC, but both parties repeatedly use the term "DGL/DCC" and conflate the two entities. Because a dismissal argument is not properly raised as to DCC in particular, I do not address whether claims against DCC may be dismissed.

4

1    McGrain timely notified Park Miller of events that compromised the Durham Entities' financial

2    security and periodically advised regarding changing practices." *Id.* ¶ 70; *see also id.* ¶ 41 (listing

3    three times in 2011, 2014 and 2017 when McGrain informed Park Miller about potential issues

4    that could impact DGL/DCC's finances).

5         They contend that contrary to this "longstanding and expected practice of transparency and

6    full disclosure, sometime prior to October 2016, McGrain and [DGL]/DCC changed their practice

7    in the factoring business without advising Park Miller or other [contracting plaintiffs]."  SAC ¶ 44.

8    They claim that DGL acquired account receivables from 1-800 Solar, but the receivables were

9    different and far less valuable than normal receivables because they were receivables for work that

10   had not been performed and as such, the receivables were not owned until the work was

11   performed.  *Id.*  Plaintiffs add that if this had been disclosed, Park Miller would never have

12   approved of it and would have taken steps to extract its clients from DGL/DCC investments.  *Id.* ¶

13   45.

14        Despite knowing that 1-800 Solar's assets were not worth what they were represented as,

15   and ultimately that there was no chance of recovery on the 1-800 Solar assets, DGL/DCC's

16   financial statements continued to reflect the receivables as active full value assets.  SAC ¶ 67.

17   Instead of disclosing the compromised financial situation, McGrain continued to reach out to Park

18   Miller through 2016, 2017, and 2018 to seek additional investments for DCC's factoring

19   business." *Id.* ¶ 72.  In particular, the SAC adds that in reliance on these

20   misrepresentations/nondisclosures, Park Miller facilitated additional investments between its

21   clients and DGL, including investments with the Lawsons, Gregory and Suzanne Combs, and

22   Choplin and Mone (hereinafter referred to as "LCCM plaintiffs").  *Id.* ¶ 84.  They claim that the

23   misrepresentations caused contracting plaintiffs to delay efforts to collect from DGL earlier,

24   causing them financial harm.  *Id.* ¶ 86.

25        Park Miller lost six (6) clients and suffered monetary and reputational harm as a result of

26   defendants' misrepresentation.  SAC ¶¶ 88-92.  It is facing several "threatened lawsuits from

27   former clients," one of whom has filed a petition before the American Arbitration Association and

28   another who filed a complaint with the U.S. Securities and Exchange Commission.  *Id.* ¶ 90.

United States District Court
Northern District of California

5

### 3. Park Miller's Discovery of the Inaccurate Financial Information

The SAC now explains how Park Miller came to discover the inaccurate financial representations in November 2018 and the "evasive and deceptive" answers McGrain gave about DGL/DCC's financial situation. In 2014, McGrain informed Park Miller that one of DCC's clients, Connolly Geaney Ablitt & Wilard, P.C. ("Ablitt"), diverted several million dollars' worth of payments over notice, and due to DCC, from various loan servicers making the receivables essentially worthless. SAC ¶ 41. In October 2018, Miller learned that Ablitt filed for summary judgment against DCC and Maasai Holdings in its bankruptcy proceedings. *Id.* ¶ 75. As a result, Miller wanted to fully vet DGL/DCC's financial statements in order to ensure it would remain in a strong enough financial condition to continue to pay its clients according to the terms of the promissory notes. *Id.*

Upon his review, Miller noticed that the gross profitability of DGL/DCC had deteriorated and that the gross profit was abnormally low given the represented assets of the companies. *Id.* ¶ 76. He asked McGrain about this, who insisted that the change was due to "increased legal expenses." *Id.* ¶ 77. When Miller responded that legal expenses should not affect *gross* profitability, McGrain replied that the change was "due to reduced holdbacks on initial purchase payments driven by market forces." *Id.* Miller thought that this was plausible, but still did some additional research to confirm. *Id.*

He asked McGrain for the "granular, customer by customer, factoring data." Upon review of this data on or about November 2018, he discovered that the 1-800 Solar receivables on the financial statements reflected as "active assets" worth over $1,797,000 were, in fact, long overdue, and should not have been included as "active assets." SAC ¶ 79. After this discovery, he asked McGrain on the telephone whether the 1-800 Solar receivables were any good. McGrain "finally admitted that there as a problem with the 1-800 Solar receivables, that 1-800 Solar has declared bankruptcy and that the receivables were not recoverable." *Id.* ¶ 80. Plaintiffs claim that this was the "first time McGrain disclosed to Park Miller the long concealed fact that the Durham Entities were involved with factoring with business for work that was not yet completed" and that this information was material because it increased the risk of Park Miller's clients investments. *Id.* ¶

6

82.

Based on these allegations, all plaintiffs bring fraud claims against all defendants.  SAC ¶¶ 133-169 (COA 6 for fraud/intentional misrepresentation in under Civ. Code § 1572; COA 7 for fraudulent deceit under Cal. Civ. Code §§ 1709-1710; COA 8-9 for negligence and negligent misrepresentation).  Park Miller also brings two claims against all defendants based on the clients and money it lost due to defendants' fraud.  SAC ¶¶ 170-191 (COA 10 for intentional interference with contractual relations; COA 11 for negligent interference with prospective economic relations).

## LEGAL STANDARD

## I.   RULE 12(B)(6): MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).  However, "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule 8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011).  In deciding a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*,

United States District Court
Northern District of California

1   828 F.2d 556, 561 (9th Cir. 1987).  But the court is not required to accept as true "allegations that

2   are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead*

3   *Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

4   **II.      RULE 12(B)(2): MOTION TO DISMISS FOR LACK OF PERSONAL**

5   **JURISDICTION**

6          Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to

7   dismiss for lack of personal jurisdiction.  The plaintiff then bears the burden of demonstrating that

8   jurisdiction exists.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

9   The plaintiff "need only demonstrate facts that if true would support jurisdiction over the

10  defendant."  *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995); *Fields v. Sedgwick Assoc.*

11  *Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986).  "Although the plaintiff cannot simply rest on the

12  bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as

13  true."  *Schwarzenegger*, 374 F.3d at 800 (citations omitted).  Conflicts in the evidence must be

14  resolved in the plaintiff's favor.  *Id.*  "Where, as here, the motion is based on written materials

15  rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of

16  jurisdictional facts.  In such cases, we only inquire into whether [the plaintiff's] pleadings and

17  affidavits make a prima facie showing of personal jurisdiction."  *Caruth v. International*

18  *Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995) (internal punctuation and citation

19  omitted).

20         Where, as here, there is no applicable federal statute governing personal jurisdiction, the

21  law of the state in which the district court sits applies."  *Core-Vent Corp. v. Novel Indus. AB*, 11

22  F.3d 1482, 1484 (9th Cir. 1993) (citation omitted).  "California's long-arm statute allows courts to

23  exercise personal jurisdiction over defendants to the extent permitted by the Due Process Clause of

24  the United States Constitution."  *Id.*; Cal. Civ. Proc. Code § 410.10.  "Because California's long-

25  arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional

26  analyses under state law and federal due process are the same."  *Schwarzenegger*, 374 F.3d at 800-

27  01.

28         "There are two types of personal jurisdiction:  general and specific."  *Fields v. Sedgwick*

United States District Court
Northern District of California

*Associated Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986).  "[G]eneral jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the word."  *Schwarzenegger*, 374 F.3d at 801.  It exists where a nonresident defendant's activities within a state are "substantial" or "continuous and systematic."  *Data Disc., Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977).  Such contracts must "be of the sort that approximate physical presence."  *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

Specific jurisdiction arises when a defendant's specific contacts with the forum give rise to the claim in question.  *Helicoptoros Nacionales de Columbia S.A. v. Hall*, 466 U.S. 408, 414-16 (1984).  "A court exercises specific jurisdiction where the cause of action arises out of or has a substantial connection to the defendant's conduct with the forum."  *Glencore Grain Rotterdam BV v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002).  The Ninth Circuit employs a three-part test to determine whether there is specific jurisdiction over a defendant:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1023 (9th Cir. 2017).

The first prong may be satisfied by "purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof."  *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).  In tort cases, courts typically inquire whether a defendant "purposefully directs his activities at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum."

1   *Id.*[3]  In contrast, in contract cases, courts typically inquire whether a defendant "purposefully

2   avails itself of the privilege of conducting activities or consummates a transaction in the forum,

3   focusing on activities such as delivering goods or executing a contract."  *Id.* (citation and internal

4   punctuation omitted).

5        With regard to the second prong, courts "measure this requirement in terms of 'but for'

6   causation."  *Bancroft & Masters*, 223 F.3d at 1088.  The plaintiff bears the burden of satisfying the

7   first two prongs of the test.  *Schwarzenegger*, 374 F.3d at 802.  If the plaintiff succeeds in

8   satisfying both of the first two prongs, the burden then shifts to the defendant to "present a

9   compelling case" that the exercise of jurisdiction would not be reasonable."  *Id.*  If the plaintiff

10  cannot satisfy either of the first two prongs, personal jurisdiction is not established in the forum

11  state.  *Id.*

## DISCUSSION

## I.    REQUEST FOR JUDICIAL NOTICE

14       Plaintiffs seek judicial notice of the summary judgment briefing, discovery responses, and

15  summary judgment decision made in the bankruptcy proceeding that initially prompted Miller to

16  inquire into DGL/DCC's financial status.  *See* Request for Judicial Notice in Support of Plaintiffs'

17  Opposition to Motion to Dismiss Second Amended Complaint for Lack of Personal Jurisdiction

18  and for Failure to State a Claim ("Miller RJN") [Dkt. No. 35] (seeking judicial notice of

19  documents in bankruptcy case filed before the United States Bankruptcy Court for the District of

20  Massachusetts, *Stewart F. Grossman, Chapter 7 Trustee of The Estate of Connolly Geaney Ablitt

21  & Willard, P.C., v. Durham Commercial Capital Corp. and Maasai Holdings, LLC*, Adv. Proc.

22  No. 16-01163-JNF (hereinafter "Ablitt Bankruptcy Case")).   They do so to show that there was a

23  bankruptcy case involving one of DCC's clients, DCC and Maasai Holdings, and that there was a

24  motion for summary judgment filed against DCC and Maasai in that case, which was ultimately

25  granted by the court.  *See* Reply in Support of Plaintiffs' Request for Judicial Notice RE: Motion

26

27  ─────────────────────
    [3] However, as the Supreme Court reemphasized in *Walden v. Fiore*, 571 U.S. 277, 285 (2014) the
28  "effects" "analysis looks to the defendant's contacts with the forum State itself, not the
    defendant's contacts with persons who reside there."

United States District Court
Northern District of California

to Dismiss Second Amended Complaint ("Miller Reply RJN") [Dkt. No. 41] 4.  They claim that these documents are relevant to their fraud allegations in the SAC; in particular, that in October 2018, Miller learned that the opposing party in this bankruptcy case filed a summary judgment motion against DCC and Maasai Holdings and that as a result Miller "wanted to fully vet [DGL]'s and DCC's financial statements in order to ensure [that] they would remain in strong enough financial standing to continue to pay Park Miller's clients according to the terms of the Promissory Notes."  *Id.* at 3 (quoting SAC ¶ 75).  They insist that they "do not rely on the truth of the matters asserted in these documents; rather, they demonstrate that the documents exist and contain the referenced statements."  Miller Reply RJN at 6.

Plaintiffs also request judicial notice of the Ablitt Bankruptcy Case documents because they contain statements that contradict statements made by McGrain in his declaration accompanying defendants' motion to dismiss.  Miller Reply RJN at 6; *see* Declaration of Craig McGrain in Support of Defendants' Second Motion to Dismiss ("McGrain Decl.") [Dkt. No. 33-1].  I am not considering McGrain's declaration to the extent that it attempts to introduce extrinsic evidence to a motion to dismiss for failure to state a claim; I must take the factual allegations in the SAC as true.  Although declarations may be considered in a motion to dismiss for lack of personal jurisdiction, "[c]onflicts between facts contained within declarations or affidavits are resolved in the Plaintiff's favor."  *Michael v. New Century Fin. Servs.*, 65 F. Supp. 3d 797, 803 (N.D. Cal. 2014) (citing *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 861-62 (9th Cir. 2003)).  Here, plaintiffs seek to use these documents to contradict statements made by McGrain in his declaration and reinforce their allegation that (i) First Austin is not simply a paper product company but has some involvement in the factoring business and (ii) Maasai Holdings is under the same management and control of DGL/DCC.  As discussed in Section V of this Order, these allegations, taken as true, are still not enough to impose alter ego liability over First Austin and Maasai Holdings.

As a result, plaintiffs" request for judicial notice of these documents is GRANTED only for their existence and the existence of their contents, not for the truth of their contents.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (internal quotation marks and citation

1    omitted) ("On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another

2    court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of

3    the opinion, which is not subject to reasonable dispute over its authenticity."); *Wyatt v. Terhune*,

4    315 F.3d 1108, 1114 n. 5 (9th Cir. 2003), *overruled on other grounds by Albino v. Baca*, 747 F.3d

5    1162, 1168-71 (9th Cir. 2014) ("Factual findings in one case ordinarily are not admissible for their

6    truth in another case through judicial notice.").

7    **II.     FAILURE TO STATE FRAUD CLAIMS**

8            Plaintiffs' fraud claims are denominated as fraud (COA 6), fraudulent deceit (COA 7),

9    negligence (COA 8), negligent misrepresentation (COA 9), intentional interference with

10   contractual relations (COA 10) and negligent interference with prospective economic relations

11   (COA 11).  COAs 6 and 7 relate to alleged promissory fraud that occurred on the promissory notes

12   between contracting plaintiffs and DGL.  To sufficiently allege COAs 6 through 9, plaintiffs must

13   meet the heightened pleading standard under Rule 9(b) and state with particularity the

14   circumstances constituting fraud.

15           COAs 10 and 11 relate to the business relationships that were allegedly severed between

16   Park Miller and its clients due to defendants' interfering actions.  Park Miller's interference claims

17   rely on more than defendant's fraudulent acts, and therefore must be sufficiently pleaded under

18   Rule 8, not the heightened pleading standard under Rule 9(b).

19       **A.     Specificity of Fraud Claims**

20           The SAC identifies with sufficient particularity the who, what, when, where and how of

21   the misconduct.  Plaintiffs allege that defendants knew of DGL/DCC's compromised financial

22   status beginning in 2016 when they provided at least $1,797,000 to 1-800 Solar for work that had

23   not yet been completed and "learned soon after that there were issues with 1-800 Solar's financial

24   condition and collectability of the receivables."  SAC ¶ 66.  They claim that defendants knew or

25   should have known that 1-800 Solar was "in financial distress, many of the receivables would not

26   become due as 1-800 Solar could not perform the required work, and it would have to file for

27   bankruptcy," which it eventually did in April 2018.  *Id.*  But despite this knowledge, defendants

28   continued to incorrectly reflect 1-800 Solar's assets as "active full value assets" in financial

statements provided to Park Miller such that it appeared that DGL could continue paying interest on the promissory notes with contracting plaintiffs. *Id.* ¶¶ 67, 73. They claim that in accordance with standard financial practice, these receivables should not have been reflected as good assets and should have been reflected their discounted value, if any, due to the fact that they were contingent on future performance. *Id.* ¶ 69. Park Miller and its clients relied on full and accurate disclosure and this false reporting prevented them from realizing the true financial condition of DGL/DCC. *Id.* ¶¶ 69, 71.

Plaintiffs also allege that McGrain himself knew that the financial statements sent to plaintiffs were inaccurate but "permitted" them to be sent anyway. SAC ¶ 71. Despite the compromised financial situation, he continued to reach out to Park Miller through 2016, 2017 and 2018 to seek additional investments for DCC's factoring business. *Id.* ¶ 72; *see also id.* ¶ 85 (alleging that the LCCM plaintiffs would not have invested if the true financial status of DGL/DCC and the nature of their business practices were known to them). The SAC now explains in more detail how Miller discovered the alleged fraud and how McGrain provided evasive and deceptive answers about DCC/DGL's financial situation in conversations with Miller. *Id.* ¶¶ 74-82.

Defendants argue that they provided documents with the alleged omitted information that made Park Miller aware of 1-800 Solar's financial status. This argument directly contradicts the facts alleged in the SAC.[4] In considering a motion to dismiss for failure to state a claim, I must accept the factual allegations in the SAC as true. Defendants' argument is not a challenge to the sufficiency of the allegations in the SAC; it is an attempt to argue the merits of the claims.

Because the SAC sufficiently links how the circumstances surrounding 1-800 Solar constitute fraud, defendants' motion to dismiss the fraud claims is DENIED. However, plaintiffs have only sufficiently alleged their fraud claims against DGL/DCC, not the other three defendants who are dismissed for lack of personal jurisdiction. *See infra* Sections IV and V (discussing

---

[4] The allegation that "the receivables continued to be reflected on the Durham financial statements as active full value assets" is disputed by defendants, who argue that "the collectability and status of the 1-800 Solar aging receivables was transmitted to John Miller by DCC/DGL staff repeated for months." SAC ¶ 67; Mot. 11.

1    McGrain, First Austin and Maasai Holdings).

2                    **1.     Promissory Fraud**

3           Two of plaintiffs' claims, COAs 6 and 7, relate to the promissory fraud that occurred

4    pertaining to the promissory notes between contracting plaintiffs and DGL.  For a promissory

5    fraud cause of action, a plaintiff must plead facts—other than mere nonperformance—

6    demonstrating that the promises were knowingly false when made; in other words, that they were

7    made without any intention of performance.  *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638

8    (1996).)  There must be other factual allegations – other than simple nonperformance – to

9    adequately allege that a defendant made knowingly false promises without an intent to perform.

10   *See Sunnyside Development Co., LLC v. Opsys Ltd.*, No. C 05-0553 MHP, 2005 WL 1876106, *6

11   (N.D. Cal. Aug. 8, 2005).

12          I previously dismissed plaintiffs' promissory fraud claims because the FAC alleged that

13   the fraud occurred at the time of the alleged April 2018 bankruptcy of 1-800 Solar and only one

14   contracting plaintiff, Lawson Land, Inc., executed a promissory note after that date (in July 2018).

15   *See* Order at 11.  The SAC now alleges that the fraud occurred sometime in 2016, when

16   DGL/DCC first commenced dealing with 1-800 Solar, because they allegedly "knew or should

17   have known that their financial status had detrimentally changed because they [sic] provided at

18   least $1,797,000 to 1-800 Solar for receivables that were not yet due and payable" and "learned

19   soon thereafter that there were issues with 1-800 Solar's financial condition and the collectability

20   of the receivables."  SAC ¶ 66.  As a result, it is not only the July 2018 promissory note with the

21   Lawsons (Exhibit C) that is implicated, but three additional promissory notes as well: (i)

22   December 2017 promissory note with the Lawsons (Exhibit B); (ii) November 2016 promissory

23   note with Gregory and Suzanne Combs (Exhibit G); (iii) and October 2016 promissory note with

24   Choplin and Mone (Exhibit I).  These together are the LCCM plaintiffs.  *Compare* SAC ¶¶84-85

25   *with* FAC ¶¶ 58-59

26          Plaintiffs allege that defendants knew at the time of the LCCM plaintiffs' investments that

27   they were not able to pay the principal back because of their poor financial condition and instead

28   intended to keep the money invested by the LCCM plaintiffs for their own personal use and did

1    not intend to repay the principal or the interest accrued.  *See* SAC ¶¶ 140, 151.  Defendants do not

2    respond to this new allegation from the LCCM plaintiffs and instead argue as if the alleged fraud

3    occurred in 2018, as it was initially alleged in the FAC.

4         Plaintiffs have adequately alleged promissory fraud on behalf of the LCCM plaintiffs

5    because they allege that defendants entered promissory notes with the LCCM plaintiffs with no

6    intention to perform or entered them knowing that they could not perform.  Defendants' motion to

7    dismiss the promissory fraud claims brought by the LCCM plaintiffs is DENIED but is

8    GRANTED with respect to the other plaintiffs; although the SAC states that these claims are

9    brought on behalf of all plaintiffs, in fact the promissory fraud claims are only alleged on behalf of

10   the LCCM plaintiffs.

11        **B.    Interference Claims**

12        Park Miller brings two interference claims – intentional interference with contractual

13   relations (COA 10) and negligent interference with prospective business relations (COA 11).

14   Plaintiffs argue that they are not required to plead these claims with Rule 9(b) specificity because

15   the interference claims rely on more than defendant's fraudulent acts; they rely on both

16   defendants' misrepresentations and DGL/DCC's failure to perform.  Plaintiffs' Opposition to

17   Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim ("Oppo.")

18   [Dkt. No. 34] 16.  This characterization was not clearly reflected in the FAC, but it is now in the

19   SAC.  *See* SAC ¶¶ 170-192; Order at 12.  Rule 9(b) does not apply to these interference claims.

20   *See Oracle Am., Inc. v. TERiX Computer Co.*, Inc., No. 5:13-CV-03385-PSG, 2014 WL 31344, at

21   *11 (N.D. Cal. Jan. 3, 2014) (citation omitted). (Rule 9(b) did not apply to the interference claim

22   because the plaintiff's interference claim "reli[ed] on several instances of misconduct, including

23   violations of the [Computer Fraud and Abuse Act] and [] unfair competition"); *see also id.* (a

24   plaintiff alleges a claim sounding in fraud when it "allege[s] a *unified* course of fraudulent conduct

25   and conduct[s] and rel[ies] *entirely* on that court of conduct as the basis of its interference claims")

26   (emphasis added).

27        Unhelpfully, the parties do not differentiate between the two interference causes of actions

28   in their briefs.  I discuss them separately because these are different torts with different elements.

15

United States District Court
Northern District of California

1.      **Intentional Interference with Contractual Relations**

In my previous order, I dismissed Park Miller's interference claims because it failed to "specifically allege[] that any of its contracts have been breached or any prospective economic relations that have been lost." Order at 12 (relying on *Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. C 14-0437 CW, 2014 WL 5812294, at *8 (N.D. Cal. Nov. 7, 2014)). Park Miller now argues that it "need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations" because California courts have "recognized that interference with the plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more burdensome." Oppo. 17 (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1129 (1990)).

In *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, the California Supreme Court stated the elements of intentional breach of contractual relations as: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) *actual breach or disruption* of the contractual relationship; and (5) resulting damage." 50. Cal. 3d at 1126 (emphasis added). Some courts have worded the standard like this, holding that actual breach is not required to state a claim for this tort. *See, e.g.*, *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1230 (C.D. Cal. 2012); *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*, No. 5:12-CV-6209-EJD, 2014 WL 3372583, at *12 (N.D. Cal. July 9, 2014) (finding actual breach is not a required element because "[w]hile the tort of inducing breach of contract requires proof of a breach, the cause of action for interference with contractual relations is distinct and requires only proof of interference").

But other courts in this District have dismissed claims that fail to allege actual breach, including the one I relied on in my previous order. *See, e.g.*, *Heartland*, 2014 WL 5812294, at *8 ("Heartland does not allege that any of its contracts with any former merchant have actually been breached, much less breached because of interference by Mercury."); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1365 (N.D. Cal. 2013) (requiring actual breach as an element). I follow the line of cases that requires "actual breach or disruption of the

contractual relationship" because that is how the California Supreme Court has stated the element.

With that clarification, I find that Park Miller plausibly alleges all elements of this tort. It alleges that (i) there were valid contracts between it and contracting plaintiffs (SAC ¶ 171); (ii) defendants had knowledge of these contracts given their intentional acts of reaching out to Park Miller to solicit investments from its clients (SAC ¶¶ 172, 174)[5]; (iii) defendants' "conduct of failing to perform on the promissory notes and their deliberate misrepresentations" led to this interference (SAC ¶ 173); and (iv) these acts "made performance of Park Miller more expensive and difficult," led to at least six (6) lost clients (SAC ¶¶ 173, 176) and (v) caused Park Miller to lose revenue, face several threatened lawsuits from its clients, and suffer reputational harm as a wealth advisory firm (SAC ¶¶ 177-179).

## 2. Negligent Interference with Prospective Economic Advantage

In order to state a claim for negligent interference with prospective economic advantage, a plaintiff must allege "(1) an economic relationship between plaintiff and a third party or parties; (2) defendants' knowledge of that relationship; (3) negligent acts to disrupt that relationship; (4) wrongfulness of the interference by some legal measure other than the fact of the interference itself"; (5) actual disruption of the relationship; and (6) economic harm proximately caused by the acts of defendants." *Cellars v. Pac. Coast Packaging, Inc.*, 189 F.R.D. 575, 581 (N.D. Cal. 1999) (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 393 (1995)) (internal quotation marks omitted). This tort is different from interference with contractual relations, which "does not require wrongful conduct by the defendant apart from the interference." *625 3rd St. Assocs., L.P. v. Alliant Credit Union*, 633 F. Supp. 2d 1040, 1048 (N.D. Cal. 2009) (citation

---

[5] Defendants argue that this claim is based on the premise that they knew of the contract terms between contracting plaintiffs and Park Miller and would have known that if the promissory notes were not paid, this would somehow impact the contracts between contracting plaintiffs and Park Miller. Reply Brief in Support of Motion to Dismiss ("Reply") [Dkt. No. 38]13-14. But they do not point to any authority that suggests that second element requires defendants to *know the exact terms of the contract* between contracting plaintiffs and Park Miller. Park Miller alleges that "[d]efendants knew of the contractual relationship between Park Miller and their clients, as evidenced by their intentional actions of reaching out to Park Miller to solicit investments from Park Miller's clients." SAC ¶ 172. Viewing the SAC in light most favorable to plaintiffs, they have sufficiently alleged that defendants knew of the contractual relationship between contracting plaintiffs and Park Miller

omitted).

Park Miller alleges that it was in an economic relationship with its clients, which would have resulted in a future economic benefit to Park Miller, and that defendants knew or should have known of this relationship. SAC ¶¶ 181-82. Park Miller also contends that defendants failed to fulfill their obligations and "engaged in wrongful conduct in misrepresenting [DGL's] financial status and suppressing crucial financial information that would have illuminated the truth about its financial status to Plaintiffs with the intent to mislead Plaintiff." SAC ¶¶ 184-85. Therefore, it has sufficiently alleged negligent acts that disrupted the relationship and identified the wrongfulness of the interference by some legal measure other than the fact of the interference.

Park Miller also specifically alleges that it not only lost six (6) clients and suffered reputational harm due to defendants' actions, but also that the "annual reoccurring revenue loss due to lost clients is approximately $120,858.52." SAC ¶ 187. "Additionally, as soon as Park Miller discovered Defendants' fraud and misrepresentation, Park Miller stopped charging fees related to all the Durham investment accounts," which means "[t]he annual reoccurring revenue loss from Durham investment accounts is approximately $61,425 per year." Id. ¶ 188. Park Miller also contends that it is "facing several threatened lawsuits from former clients," one of which "has filed a lawsuit before the American Arbitration Association seeking damages in excess of $4,000,000" and "[a]nother [who] has filed a complaint with the SEC." Id. ¶¶ 189, 190.

Park Miller has plausibly alleged both of its interference claims. Defendants' motion to dismiss these claims against DGL and DCC is DENIED. Defendants' motion to dismiss the interference claims as to McGrain, First Austin and Maasai Holdings is moot in light of my lack of jurisdiction.

## III.   FAILURE TO STATE BREACH OF CONTRACT CLAIMS

Defendants seek to dismiss the breach of contract claims against McGrain, First Austin and Maasai Holdings because they were not parties to the underlying promissory notes at issue. Mot. 9. Contracting plaintiffs bring these claims against them on the allegation that they are alter egos

United States District Court
Northern District of California

1    of DGL.  Oppo. 8.[6]  As discussed in the next section, this court lacks personal jurisdiction over

2    these three defendants.  Defendants' motion to dismiss the breach of contract claims against

3    McGrain, First Austin and Maasai Holdings is moot in light of my lack of jurisdiction.

4    **IV.    LACK OF PERSONAL JURISDICTION OVER MCGRAIN**

5        Plaintiffs argue that this court has personal jurisdiction over McGrain as an individual and

6    as an alter ego of DGL/DCC.  They have not provided sufficient allegations in their SAC to

7    support either argument.

8        **A.    Specific Personal Jurisdiction**

9        Plaintiffs argue that the SAC sufficiently alleges that McGrain purposefully directed his

10   business activities at California because: (i) McGrain signed at least three promissory notes

11   between DGL and contracting plaintiffs that specified performance in California (SAC ¶¶ 43, 47,

12   49, 51, 59, 61); (ii) McGrain permitted inaccurate financial statements to be sent to Park Miller

13   (SAC ¶ 71); (iii) McGrain directly solicited the investment from Park Miller's clients with full

14   knowledge that its clients largely resided in California (SAC ¶¶ 43, 37, 69); (iv) McGrain

15   continued to solicit additional investment instead of disclosing defendants' compromised financial

16   situation (SAC ¶¶ 70-72); and (v) McGrain provided evasive and deceptive answers about

17   DGL/DCC's financial situation to Miller and only admitted that there was a problem with the 1-

18   800 Solar once Miller investigated and confronted him about it. (SAC ¶74-80).

19       I already rejected plaintiffs' first argument.  Order at 13-14.  The promissory notes that

20   McGrain signed are not the subject of the breach of contract claims.  *See* SAC, Exs. A, D, and H

21   (October 1, 2010 promissory note with the Lawsons, March 28, 2011 promissory note with Miller

22   and October 13, 2010 promissory note with Choplin and Mone).

23       Plaintiffs allege that McGrain knew the financial statements of DGL/DCC were inaccurate

24   yet "permitted them to be circulated to plaintiffs anyway."  SAC ¶ 71.  Even accepting as true the

25   contested factual allegation that the reports sent to Park Miller inaccurately displayed 1-800

26

27   [6] Parties agree that the contracting plaintiffs bring individual claims for breach of contract on their
     promissory notes.  The claim is not brought on behalf of Park Miller.  *See* Oppo. 8 ("[Park Miller]
28   does not allege breach of contract with Defendants because, as defendants point out, they were not
     parties to the contracts articulated in COA 1-5.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Solar's assets, plaintiffs have not clearly alleged how McGrain was involved in that activity.

2   Simply alleging that he permitted these reports to be sent is not enough to say he purposefully

3   directed those activities.

4          Plaintiffs' added allegations that McGrain "directly solicited investments" from California

5   investors and continued to solicit additional investments after the compromised financial situation

6   are also unsupported by factual allegations.  They have not alleged which investments were

7   directly solicited by McGrain and how that connects to the alleged misrepresentation of 1-800

8   Solar that eventually caused Park Miller and contracting plaintiffs harm.

9          The only allegation with any plausible weight is the description of the evasive and

10  deceptive answers that McGrain provided to Miller when asked about DGL/DCC's financial

11  situation.  SAC ¶¶ 74-80.  But these allegations alone are not enough to plead that McGrain

12  purposefully availed himself to the extent that it would be fair to exercise personal jurisdiction

13  over him.

14         Plaintiffs have not adequately explained how McGrain's activities arose out of or relate to

15  the particular fraud and misrepresentations claims in this case.  Accordingly, they have not

16  demonstrated that exercise of specific jurisdiction over McGrain is proper.

17         **B.      Fiduciary Shield Doctrine**

18         Even if minimum contacts were established, defendants argue that the fiduciary shield

19  doctrine insulates McGrain from personal jurisdiction.  Mot. 19.  Under the fiduciary shield

20  doctrine, "a person's mere association with a corporation that causes injury in the forum state is

21  not sufficient in itself to permit that forum to assert jurisdiction over the person."  *Davis v. Metro*

22  *Prods., Inc.*, 885 F. 2d 515, 520 (9th Cir. 1989).  California state law, which governs all the causes

23  of action in this case, explicitly recognizes the fiduciary shield doctrine. *See Shearer v. Superior*

24  *Court*, 70 Cal. App. 3d 424, 430 (1977).  Thus, defendants argue, the court cannot impute personal

25  jurisdiction over McGrain simply because he is an officer or agent of DGL or DCC.  Mot. 19.

26         There are exceptions to the fiduciary shield doctrine.  One of them is for intentional

27  tortious acts committed by an officer or owner.  *See Seagate v. A.J. Kogyo Co.*, 219 Cal.App.3d

28  696, 703 (1990).  Plaintiffs argue that the tortious activity exception to the fiduciary shield

20

1    doctrine applies because "McGrain directly and affirmatively committed tortious actions directed

2    at California."  Oppo. 24.

3        I previously found that plaintiffs' support for this allegation was insufficient, and the SAC

4    does not fix the deficiencies.  An allegation that McGrain "permitted" inaccurate financial

5    statements to be sent to Park Miller is not enough.  *See* Order at 15 ("Even if the financial

6    information was inaccurate, simply being copied on an email does not show that McGrain himself

7    took part in the tortious acts of the company.").  Plaintiffs also conclusorily allege that McGrain

8    failed to disclose DGL/DCC's "financial status and method of doing business" in accordance with

9    "customary business practice" and instead "continued to reach out to Park Miller through 2016,

10   2017 and 2018 to seek additional investments for DCC's factoring business."  SAC ¶¶ 71-72.

11   This bare allegation is not sufficient to trigger the tortious activity exception of the fiduciary shield

12   doctrine.  Plaintiffs fail to explain why the fiduciary shield doctrine does not insulate McGrain

13   from the acts of DGL or DCC.

14       **C.    Alter Ego Theory**

15       Alternatively, plaintiffs argue that there is personal jurisdiction over McGrain because he

16   is the alter ego of DGL or DCC.  Oppo. 21.  To survive a motion to dismiss, a plaintiff asserting

17   application of the alter ego doctrine to extend personal jurisdiction must "allege specifically both

18   the elements of alter ego liability, as well as facts supporting each."  *MH Pillars Ltd. v. Realini*,

19   No. 15-CV-1383-PJH, 2017 WL 916414, at *12 (N.D. Cal. Mar. 8, 2017) (internal citation

20   omitted).  The plaintiff must show "(1) that there is such unity of interest and ownership that the

21   separate personalities or the two entities no longer exists, and [that] (2) that failure to disregard

22   their separate identities would result in fraud or injustice."  *Williams v. Yamaha Motor Co. Ltd.*,

23   851 F.3d 1015, 1021 (9th Cir. 2017) (citing *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir.

24   2015)).

25       The "unity of interest" prong requires "a showing that the parent controls the subsidiary to

26   such a degree as to render the latter the mere instrumentality of the former."  *Ranza*, 793 F.3d at

27   1073. (internal quotation marks and citations omitted).  Courts generally consider nine factors in

28   assessing whether the unity of interest prong of an alter ego relationship is satisfied:

United States District Court
Northern District of California

21

> (1) the commingling of funds and other assets of the entities, (2) the holding out by one entity that it is liable for the debts of the other, (3) identical equitable ownership of the entities, (4) use of the same offices and employees, (5) use of one as a mere shell or conduit for the affairs of the other, (6) inadequate capitalization, (7) disregard of corporate formalities, (8) lack of segregation of corporate records, and (9) identical directors and officers.

*Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014) (citation omitted).  While a court need not find that every factor is present, *Updateme Inc. v. Axel Springer SE*, No. 17-CV-05054-SI, 2018 WL 1184797, at *10 (N.D. Cal. Mar. 7, 2018), the Ninth Circuit has specifically found that "[t]otal ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Ranza*, 793 F.3d at 1073.  A parent's involvement in "macro-management issues" does not satisfy this element; the plaintiff must show that the parent directs the subsidiary's "day-to-day operations" and that the "entities failed to observe their separate corporate formalities." *Id.* at 1074-1075.

Plaintiffs reiterate allegations that I have already found insufficient.  Order at 13, 17. They argue that McGrain is the alter ego of DGL/DCC because he has an ownership interest in both entities, uses the same email addresses from both entities, and treats the assets of DGL and DCC as interchangeable.  Oppo. 21; SAC ¶¶ 25-26.  But McGrain's ownership interest in both entities is not enough to allege unity of interest.  *See Ranza*, 793 F.3d at 1073.  The intermingling of assets between DGL and DCC might support an alter ego theory between DGL and DCC but does not necessarily implicate McGrain himself.

Plaintiffs again allege that McGrain personally signed three of the promissory notes, but the allegations in the SAC point to promissory notes that were not signed by McGrain.  Oppo. 22; SAC ¶ 43, 49, 59; *see also* SAC, Exs. C, G (July 2, 2018 promissory note with the Lawsons and November 9, 2016 promissory note with Gregory and Suzanne Combs).  The promissory notes that McGrain did sign are not the subject of the breach of contract claims.  *See* SAC, Exs. A, D, H (October 1, 2010 promissory note with the Lawsons, March 28, 11 promissory note with Miller and October 13, 2010 promissory note with Choplin and Mone).  The promissory notes that are the subject of the breach of contract claims were not signed by McGrain.  *See* SAC ¶¶ 93-132 & Exs. B-C, E-G, I.

United States District Court
Northern District of California

The minimal additions plaintiffs made to their allegations in the SAC are also insufficient. For example, they allege that "[f]rom the beginning of the relationship, up to and including the last investment in 2018, McGrain was directly involved with every investment made between Park Miller's clients and [DGL] or DCC" and "in all cases he either directly solicited the investment or approved the investment prior to the client entering any agreement with either [DGL] or DCC." SAC ¶ 37.  They do not explain how this allegation goes towards any of the nine factors courts evaluate in looking for unity of interest.  Even if unity of interest was met, plaintiffs again fail to address the second element of alter ego liability, *i.e.*, that failure to disregard their separate identities would result in fraud or injustice.

Altogether, the SAC fails to: (i) sufficiently plead specific personal jurisdiction over McGrain because it does not allege how any of his contacts with California arise out of or relate to the underlying claims; (ii) allege why the fiduciary shield doctrine should not insulate McGrain from personal jurisdiction, even if minimum contacts were established; and (iii) allege that McGrain is the alter ego of DGL or DCC.  I GRANT defendants' motion to dismiss McGrain for lack of personal jurisdiction.

## V.     LACK OF PERSONAL JURISDICTION OVER FIRST AUSTIN AND MAASAI HOLDINGS

Plaintiffs allege that alter ego permits personal jurisdiction over First Austin and Maasai Holdings.  Their allegations in the SAC are still insufficient.

### A.     First Austin

The SAC realleges that McGrain has an ownership interest in both First Austin and DGL/DCC and that First Austin shares a website, phone number and office with DGL/DCC.  SAC ¶¶ 20, 29-30.  In my previous order, I found that it was "not clear how the allegation that First Austin bought a line of credit debt owed by DCC demonstrates that DCC and DGL fraudulently transferred its assets to First Austin to wrongfully underfund the company."  Order 19.  Instead of providing an explanation, plaintiffs simply reiterate that allegation in their SAC.  SAC ¶ 28.  The only allegation the SAC adds is that DCC pays First Austin for renting the shared office space.  SAC ¶ 30.

1    As I said before, the Ninth Circuit has found that "[t]otal ownership and shared

2    management personnel are alone insufficient to establish the requisite level of control." Order at

3    19 (quoting *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015)); *see also Corcoran v. CVS*

4    *Health Corp.*, 169 F. Supp. 3d 970, 984 (N.D. Cal. 2016) (finding plaintiffs only alleged facts as

5    to identical ownership, same offices, and identical directors, and failure to address other factors

6    weighed against finding alter ego status); *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F.Supp.3d

7    938, 955 (N.D. Cal. 2015) (unaddressed factors weigh against finding of alter ego status).  Even if

8    these allegations were somehow enough to establish a unity of interest, plaintiffs are required to

9    "allege *specifically both* of the elements of alter ego liability, as well as facts supporting each;" the

10   SAC does not state any inequitable result that would result from respecting the corporate form of

11   these separate entities.  *Sandoval*, 34 F. Supp. 3d at 1040 (citation omitted).  Plaintiffs have not

12   sufficiently alleged that this court can exercise personal jurisdiction over First Austin based on an

13   alter ego theory.

14       **B.    Maasai Holdings**

15   While I do take judicial notice of the Ablitt Bankruptcy Case documents, *see supra* Section

16   I, plaintiffs still fail to plausibly allege that Maasai Holdings is an alter ego of DCC and DGL.  As

17   stated above with respect to First Austin, total ownership, shared office space and/or shared

18   management personnel is not enough to show unity of interest.  *Ranza*, 793 F.3d at 1073.

19       I previously found that a conclusory allegation that plaintiffs are "informed and believe"

20   that Maasai Holdings "was created in order to hold the inactive assets of DGL and DCC is

21   insufficient without supporting factual allegations."  Order at 19.  Plaintiffs now add that "Maasai

22   was created for this purpose when one of DCC's Factoring Clients, [Ablitt] . . . diverted several

23   million dollars' worth of payments over notice, and due to DCC, from various loan servicers

24   making the receivables essentially worthless . . ."  SAC ¶ 32.  But it is unclear how this allegation

25   from an act that occurred in 2014 is relevant to how Maasai Holdings and DGL/DCC function

26   during the 2016-2018 period relevant in this suit.  Even if I take this factual allegation as true and

27   assume Maasai Holdings meets the unity of interest prong, plaintiffs still do not clearly allege the

28   second prong, *i.e.*, any inequitable result that would result from respecting the corporate form of

24

1    these separate entities.

2         Deviating from the rule of corporate separateness is an extreme remedy, sparingly

3    used.  *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539 (2000) (citation

4    omitted).  The facts here do not rise to such an extreme level.  Accordingly, I find that plaintiffs

5    fail to demonstrate that DGL/DCC's contacts impute general personal jurisdiction to McGrain,

6    First Austin or Maasai Holdings under a theory of alter ego liability.  Plaintiffs also fail to show

7    specific personal jurisdiction over McGrain, or that his actions fall under the tortious activity

8    exception of the fiduciary shield doctrine.  McGrain, First Austin, and Maasai Holdings are

9    DISMISSED for lack of personal jurisdiction.

10   **VI.   MOTION FOR SANCTIONS**

11        Federal Rule of Civil Procedure 11 "authorizes a court to impose a sanction on any

12   attorney, law firm, or party that brings a claim for an improper purpose or without support in law

13   or evidence."  *Sneller v. City of Bainbridge Island*, 606 F.3d 636 (9th Cir. 2010).  Where "the

14   complaint is the primary focus of Rule 11 proceedings, a district court must conduct a two-prong

15   inquiry to determine (1) whether the complaint is legally or factually 'baseless' from an objective

16   perspective, and (2) if the attorney has conducted 'a reasonable and competent inquiry' before

17   signing and filing it."  *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002)

18   (quoting *Buster v. Greisen*, 104 F.3d 1186, 1190 (9th Cir. 1997)).  A claim that has "*some*

19   plausible basis" even "quite a weak one," is not sanctionable under Rule 11.  *United Nat. Ins. Co.*

20   *v. R&D Latex Corp.*, 242 F.3d 1102, 1117 (9th Cir. 2001).  "As long as the critical information is

21   not absent altogether, lawyers may not be sanctioned for such misjudgments."  *Id.*   "An attorney

22   may not be sanctioned for a complaint that is not well-founded, so long as she conducted a

23   reasonable inquiry."  *In re Keegan Mgm't Co., Securities Litig.*, 78 F.3d 431, 434 (9th Cir. 1996).

24        Defendants largely reiterate their dismissal arguments in their motion for sanctions.  They

25   request sanctions because they argue that plaintiffs bring "baseless" claims for fraud, breach of

26   contract and personal jurisdiction over McGrain, First Austin, and Maasai Holdings when I have

27   already dismissed the FAC.  Mot. Sanctions 2.  While the amendments plaintiffs made in their

28   SAC are still insufficient in some respects, that is not enough to impose sanctions upon them.  For

United States District Court
Northern District of California

these reasons, defendants' motion for sanctions is DENIED.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss McGrain, First Austin and Maasai Holdings for lack of personal jurisdiction is GRANTED.  Defendants only sought dismissal of breach of contract claims brought by each contracting plaintiff (COAs 1 through 5) as to McGrain, First Austin and Maasai Holdings.  That motion is moot in light of my lack of jurisdiction.

My ruling on the motion to dismiss against the remaining defendants, DGL and DCC, is as follows: (i) dismissal of the promissory fraud claims brought by the LCCM plaintiffs (COAs 6 and 7) is DENIED, but it is GRANTED as brought by the other plaintiffs; (ii) dismissal of the negligence and negligent misrepresentation claims brought by all plaintiffs (COAs 8 and 9) is DENIED; (iii) dismissal of the interference claims brought by Park Miller (COAs 10 and 11) is DENIED.

Defendants' related motion for sanctions is also DENIED.

**IT IS SO ORDERED.**

Dated: April 23, 2020

William H. Orrick
United States District Judge